Argued October 30, 1963, affirmed January 22, 1964

## INDUSTRIAL AIR PRODUCTS COMPANY v. STATE TAX COMMISSION

388 P. 2d 470

*John C. Mull,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Donald H. Burnett, Assistant Attorney General, and Robert Y. Thornton, Attorney General, Salem.

*Randall S. Jones* and *L. James Bergmann,* Port-

land, argued the cause for respondent. On the brief was L. James Bergmann.

Before McAllister, Chief Justice, and Rossman, Sloan, O'Connell, Goodwin, Denecke and Lusk, Justices.

GOODWIN, J.

The Oregon State Tax Commission appeals from a decree in the circuit court which declared void a deficiency assessment against Industrial Air Products Co., an Oregon corporation, for the tax year ending January 31, 1956.

The case concerns the corporate-excise-tax consequences of a number of intercorporate transactions. We shall set out the facts substantially as they were found by the trial court:

In 1948, five brothers, Gilbert, Harold, Leonard, Manuel, and Morris Schnitzer, were equal owners of the stock of Schnitzer Steel Products Co., an Oregon corporation. (Throughout the opinion this corporation will be referred to as Schnitzer Steel.)

The same five brothers were equally interested in the plaintiff corporation. (Industrial Air Products Co. had been a corporation earlier, was in 1948 temporarily doing business as a partnership, and in 1950 was reincorporated in its present form. In this opinion plaintiff corporation will be referred to as Industrial Air.)

From some time in 1946 until November 1948, Harold Schnitzer was in the Republic of the Philippines purchasing machinery, steel, and other heavy equipment as a representative of Schnitzer Steel. His salary and expenses were paid by Schnitzer Steel.

More or less with the consent of his brothers, Harold in 1948 formed Harsh & Company, Inc., a corporation organized under the laws of the Philippines (hereinafter referred to as Harsh & Company). Harsh & Company operated in the world surplus-steel-and-machinery market substantially as Schnitzer Steel had been operating. From time to time during the next two years there were numerous transactions between Harsh & Company and Schnitzer Steel.

In 1950, Harsh & Company for all practical purposes ceased doing business. At the time its active operations ceased, Harsh & Company had on its books an account for $752,800 owed by Schnitzer Steel.

With the intercorporate accounts in the condition described, Harold, as president and general manager of Harsh & Company, demanded payment of Schnitzer Steel's debt to Harsh & Company. At this point, a difference of opinion arose between Harold and his brothers concerning their respective ownership in the stock of Harsh & Company.

In 1950, all the stock in Harsh & Company (5,000 shares less qualifying shares) stood in the name of Harold. He conceded at first, and later denied, that his brothers were equitably entitled to undetermined minority shares in the corporation. To abbreviate a long and involved story, it was finally agreed by all that Harold was entitled to 3,000 shares, or 60 per cent of Harsh & Company, and his four brothers to 500 shares, or 10 per cent, each. This agreement took effect on August 5, 1950.

Upon the settlement of the dispute concerning the ownership of Harsh & Company, Harold sold to his brothers all his voting common stock in Schnitzer Steel and in Industrial Air. Harold was thereby removed as a shareholder in all voting common stock

of those two corporations. His brothers, however, remained for a time as minority shareholders in Harsh & Company.

Industrial Air, meanwhile, had undergone substantial growth. It had also become indebted to Schnitzer Steel in the sum of $738,587.28. Industrial Air had insufficient cash on hand to pay this debt. Accordingly, the stockholders of Industrial Air and Schnitzer Steel (identical individuals) ratified another part of the agreement of August 5, that the satisfaction of Industrial Air's indebtedness should be accomplished through a transfer to Schnitzer Steel of Industrial Air's capital stock. Industrial Air thereupon issued 75,000 shares of Class B, nonvoting stock at a par value of $10 per share. In due course, 73,858 shares of this stock, plus $7.28 cash, were transferred to Schnitzer Steel. Industrial Air thus freed itself of a $738,587.28 debt but acquired a new stockholder.

Schnitzer Steel, also in 1950, paid its debt to Harsh & Company. The debt was paid in part by transferring to Harsh & Company 27,500 shares of the Class B stock which it had received from Industrial Air. Schnitzer Steel also paid certain Philippine income taxes owed by Harsh & Company. The balance of the debt was paid by a note for $402,000 and $60,000 in cash. (It is unnecessary, for the purposes of this case, to detail the other portions of the agreement of August 5, 1950, including satisfaction of individual indebtedness owing the brothers by Industrial Air through transfers of Class B stock.)

During the next two or three years, Harold withdrew substantially all of Harsh & Company's cash, including the cash payments made by Schnitzer Steel which retired the $402,000 note. At the time of these withdrawals they were shown in the Harsh & Company

books as loans. Harold's withdrawal of the cash left Harsh & Company holding the above-mentioned 27,500 shares of Industrial Air's Class B stock and virtually nothing else of value. Harsh & Company at this time was owned, as noted, 40 per cent by four brothers and 60 per cent by Harold.

In August of 1954, certificates of Harsh & Company stock were issued to the five brothers to reflect their 1950 agreement concerning the ownership of Harsh & Company. Delays in obtaining the release of the corporation's stock book from the Philippines apparently explained the delay of some four years in making the four brothers shareholders of record in Harsh & Company. At any rate, the trial court accepted this explanation.

Two months after they became shareholders of record, in October of 1954, Gilbert, Leonard, Manuel, and Morris donated all their stock in Harsh & Company, totaling 2,000 shares, to Industrial Air. This contribution was made, they testified, to strengthen the financial position of Industrial Air. Industrial Air thus became the record owner of 40 per cent of the stock of Harsh & Company. Harsh & Company's assets at the time included stock in Industrial Air of a total par value of $275,000.

Thus, on October 1, 1954, Industrial Air was the record owner of 40 per cent of Harsh & Company, for which it had paid nothing, and Harsh & Company owned Industrial Air stock with a total par value of $275,000. Harold remained the record owner of 60 per cent (less qualifying shares, in which he was beneficial owner) of Harsh & Company. Harsh & Company, meanwhile, "owned" the so-called "loans" made by Harsh & Company to Harold, or to corporations controlled by him, totaling some $462,369.76.

Whether or not these so-called "loans" were indeed loans to Harold or were liquidating dividends "paid" to him has become something of an academic issue between the parties in this litigation. The withdrawals were found by the trial court to have been in fact liquidating dividends to Harold. For the purposes of this appeal, we can accept that fact as proven by other evidence without ruling on a peripheral issue tendered in the briefs. The trial court held that the State Tax Commission was bound by its treatment of the loans as dividends in other proceedings against another taxpayer (Harold Schnitzer). The Commission assigns this holding as error. We do not decide whether the Commission is bound to take consistent positions with reference to the tax liability of two or more taxpayers arising out of a single transaction. The question is interesting, but is not necessary to a decision in this case.

On February 8, 1955, the stockholders of Industrial Air specially convened and authorized the corporation's board of directors to distribute its 2,000 shares of Harsh & Company to the latter in redemption of the 27,500 shares of Industrial Air Class B stock. The avowed purpose of this intercorporate exchange was elimination of Harsh & Company from all participation in the affairs and ownership of Industrial Air as well as a partial liquidation of Industrial Air.[①] Later that same day the board of directors of Industrial Air met and adopted a similar resolution. No reference was made at either meeting to a possible complete liquidation of Harsh & Company.

The trial developed sharp differences of opinion

---

[①] ORS 317.010 (5) " 'Distribution in partial liquidation' means a distribution, or one of a series of distributions, by a corporation in complete cancelation or redemption of a part of its stock."

concerning the legal effect of some of the foregoing facts, but little substantial dispute concerning the facts themselves. Where conflicting inferences were to be drawn from the evidence, the trial judge drew the inferences he deemed most reasonable upon the whole record. Our examination of the record reveals no cause to draw other inferences. We accept the facts as they were found below. ORS 17.440 requires this court to consider the evidence *de novo* in cases of this character. We have done so, but have found no reason to disturb the findings made by the trial judge.

Having established the facts, the trial court concluded that the transaction was tax-exempt as a complete liquidation of a subsidiary (Harsh & Company) occurring within one year under ORS 317.245. The Commission urges that this conclusion is in error. We need not decide in this case whether the court erred in the application of ORS 317.245, because there is another basis for sustaining the trial court's decree.

It must be remembered that the transaction in which Harsh & Company distributed an asset to Industrial Air was incidental to a partial liquidation of Industrial Air. The asset being distributed to Industrial Air by Harsh & Company was Industrial Air's own stock. Even though receipt of this asset was not necessarily exempt as a distribution under ORS 317.245, the taxpayer says the return of its own stock falls outside the statutory definition of taxable income, as interpreted by Regulation 7.105-(P) of Oregon State Tax Commission, Personal Income and Corporation Income and Excise Tax Laws and Regulations (1955). That regulation provides:

> "Where a corporation has not been dissolved but is liquidating, or where a corporation has been dissolved but continues its business in liquidation,

· any sales or ·other transactions by the receiver, trustees or other persons in charge of the liquidation are treated as being made by the corporation. No gain or loss ordinarily is realized by a corporation from the mere distribution of its assets in kind in partial or complete liquidation."

Here the taxpayer, Industrial Air, exchanged an asset (2,000 shares of Harsh & Company stock) with a shareholder (Harsh & Company) for outstanding stock (27,500 shares of Industrial Air Class B nonvoting) in partial liquidation of Industrial Air's capital.

The federal counterpart of the Oregon regulation arose initially through long-established administrative practice. *Hellebush v. Commissioner of Internal Revenue,* 65 F2d 902, 903 (6th Cir 1933) ; *Lencard Corporation,* 47 BTA 58, 60 (1942); *acq.,* 1942-2 Cum Bull 12. It was approved by *U. S. v. Cumberland Pub. Serv. Co.,* 338 US 451, 455, 70 S Ct 280, 94 L Ed 251 (1950), before receiving belated statutory recognition in section 336 of the Internal Revenue Code of 1954.

Although the Oregon regulation, apparently not hitherto the subject of judicial scrutiny, has remained on the level of an administrative rule, nevertheless we hold it to be a permissible interpretation, issued by the Commission pursuant to ORS 306.100 (1) [now 305.100 (1)], of the definition of "gains, profits or income." The federal experience suggests this conclusion. For a recent interpretation of the federal statute, see *Johnson, Carvell & Murphy v. Riddell,* 173 F Supp 214 (SD Cal 1959).

■■ Industrial Air's contention that its exchange of stock with Harsh & Company was a tax-exempt partial liquidation of Industrial Air under Or. Reg. 7.105-(P) presents the question, therefore, whether there is any

conflict between the regulation and the statutes which create tax liability. If there is such a clash, the statutes would govern. See, e.g., *Scofield v. Lewis,* 251 F2d 128, 132 (5th Cir 1958) ; 1 Mertens, Federal Income Taxation, § 3.21 (rev ed 1962). Indeed, the drafters of Reg. 7.105-(P) may have recognized the possibility of such a situation when they limited to the ordinary case the regulation's applicability.

The Commission asserts that, as applied in this case, the regulation is in conflict with the statutes which define income. The conflict, so the argument goes, arises from the supposed failure of Harsh & Company's distribution of Industrial Air stock to qualify for exemption under a timely "plan" of dissolution and liquidation. Assuming that the Harsh & Company distribution did not qualify for exemption, the Commission says the gain therein is taxable notwithstanding the fact that the distribution also amounted to a partial liquidation of Industrial Air's outstanding capital. The Commission asserts that where there is a failure to satisfy a statute which, if satisfied, would make a transaction nontaxable, a regulation cannot intervene to render the transaction nontaxable. The argument, while interesting, is profitless. All gains presumably are taxable. A gain that is taxable because it arose out of a transaction that failed to comply with a specific statutory exemption is no more or less taxable than any other gain, with reference to which no attempt may have been made to seek exemption. A gain is a gain. A distribution of some other asset by Harsh & Company to Industrial Air, such as cash, stock in other corporations, land, or other assets distributed in liquidation that failed to qualify for exemption under ORS 317.245, would have been fully taxable to Industrial Air. The particular asset

transferred, however, qualifies for exemption under the regulation because it is not just a high-value asset being distributed to Industrial Air in exchange for a low-basis asset, but it is Industrial Air's own stock, returning to the issuing corporation in a partial liquidation of Industrial Air's capital. It is the act of the taxpayer, not of Harsh & Company, that is controlling.

One of the factors in the case at bar that is somewhat extraordinary is that the Harsh & Company stock with which Industrial Air redeemed its own outstanding shares came to Industrial Air as a gift. The Commission argues that this fact removes the exchange from the "ordinary-case" protection of the regulation. It contends that the entire series of transactions was designed to permit Industrial Air to pay a substantial debt with its own stock and then to recover a portion of such stock at no cost, thereby realizing a gain. This may be true, but there is no evidence in the record to support the assertion. That fact, moreover, if it were a fact, would not make the transaction taxable if it would not otherwise be taxable. Suppose, for example, that Industrial Air, instead of receiving a gift of the stock, had paid the four brothers $100,000 each for their Harsh & Company stock and then had used the Harsh & Company stock to redeem its own outstanding Class B stock. In that case there would have been a loss on the partial liquidation of Industrial Air's own capital. The loss could not be taken for tax purposes under Reg. 7.105-(P). Here, it has been stipulated that a gain was realized,[2] but the gain is not recognizable for tax purposes. The Commission suggests no reason why stock received

[2] For the purposes of this case we have accepted the apparent agreement of the parties that Industrial Air's basis in the Harsh & Company stock was zero.

as a gift should not be distributed to a shareholder in exchange for a corporation's own outstanding stock, so long as there is no proof that the scheme was a sham. There is no such evidence in this case.

We need not decide in this case whether any tax liability was incurred by the individuals when they acquired the 2,000 shares of Harsh & Company stock and then gave it away. So far as Industrial Air is concerned, it simply exchanged an asset (the Harsh & Company stock) for its own stock which it retired.

The decree is affirmed.